## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CONFORMIS, INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | C.A. No. 1:19-cv-01528-RGA |
| v. | ) | (CONSOL.) |
| | ) | |
| ZIMMER BIOMET HOLDINGS, INC. and ZIMMER, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| CONFORMIS, INC. | ) | |
| | ) | |
| Plaintiff, | ) | C.A. No. 1:19-1618-RGA |
| | ) | |
| v. | ) | **JURY TRIAL DEMANDED** |
| | ) | ████████████████ |
| MEDACTA USA, INC. | ) | |
| | ) | |
| Defendant. | ) | |

### DEFENDANT'S BRIEF IN SUPPORT OF ITS SUMMARY JUDGMENT AND *DAUBERT* MOTIONS

Jason C. White (admitted *pro hac vice*)
Scott D. Sherwin (admitted *pro hac vice*)
Nicholas A. Restauri (admitted *pro hac vice*)
Karon N. Fowler (admitted *pro hac vice*)
Michael T. Sikora (admitted *pro hac vice*)
Morgan, Lewis & Bockius LLP
110 N. Wacker Drive, Ste. 2800
Chicago, IL  60606
Telephone:  312.324.1000
Fax:  312.324.1001
jason.white@morganlewis.com
scott.sherwin@morganlewis.com
nicholas.restauri@morganlewis.com
karon.fowler@morganlewis.com
michael.sikora@morganlewis.com

Dated:  June 3, 2022

Amy M. Dudash (DE Bar No. 5741)
Morgan, Lewis & Bockius LLP
1201 N. Market Street, Suite 2201
Wilmington, Delaware 19801
Telephone:  302.574.3000
Fax:  302.574.3001
amy.dudash@morganlewis.com

*Attorneys for Defendant Medacta USA, Inc.*

## TABLE OF CONTENTS

I.    NATURE AND STAGE OF THE PROCEEDINGS ........................................................... 1

II.   SUMMARY OF THE ARGUMENT ............................................................................... 1

III.  THE COURT SHOULD GRANT SUMMARY JUDGMENT OF NON-INFRINGEMENT REGARDING THE '482, '304, AND '161 PATENTS ............................................................................. 3

      A.    Legal Standard ............................................................................................ 3

      B.    Factual Background ...................................................................................... 5

            1.    MyKnee........................................................................................... 5

            2.    MyShoulder...................................................................................... 7

      C.    The Accused Products Do Not Have the "Patient-Specific Surface" Recited by the '482 Patent Claims 14 and 17 ................................................................... 9

            1.    The Accused Products Do Not Literally Infringe ...................................... 9

            2.    The Dedication-Disclosure Doctrine Bars Conformis's Proposed Equivalency............................................................................................. 11

      D.    The Accused Products Do Not Have a "Guide Hole" for a Surgical Pin With a Position or Orientation "to Facilitate the Placement of an Articular Repair System When the Mold Is Aligned with the Joint of the Patient".................................. 14

            1.    Surgeons Do Not Use the Accused PSI When Placement of Implant Components Occurs................................................................................ 17

            2.    Dr. Oxland Applies an Incorrect Claim Interpretation When Analyzing the Accused PSI's Function when "Aligned With" a Patient's Joint ............. 18

            3.    When the Accused PSI Is "Aligned With" a Patient's Joint, No Guide Hole "Position" or "Orientation" "Facilitate[s] Placement of an Articular Repair System" ....................................................................................... 20

IV.   THE COURT SHOULD GRANT SUMMARY JUDGMENT OF NO PRE-SUIT DAMAGES FOR THE '304, '161, AND '482 PATENTS BECAUSE CONFORMIS FAILED TO MARK PRODUCTS ........ 25

V.    THE COURT SHOULD EXCLUDE OPINIONS OFFERED BY MS. KINDLER ............................. 26

      A.    Legal Standard ............................................................................................ 26

      B.    Factual Background ...................................................................................... 26

      C.    Ms. Kindler's Hypothetical Negotiation Construct is Impermissibly Predicated on Non-Comparable Settlement Agreements ............................................................. 28

            1.    Ms. Kinlder Failed to Analyze Factors Affecting the Value of Settlement for the Non-Comparable Settlement Agreements....................................... 29

            2.    Ms. Kindler Failed to Account for Significant Differences Between the Scope of Settlement Agreement Licenses Versus the Hypothetical Negotiation................................................................................................ 33

3.    Ms. Kindler Impermissibly Relies on Settlement Agreements Occurring After the Hypothetical Negotiation.......................................................... 38

VI.    CONCLUSION................................................................................................................. 39

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Applied Med. Res. Corp. v. U.S. Surgical Corp.*,
  435 F.3d 1356 (Fed. Cir. 2006)...............................................................................38

*Arctic Cat Inc. v. Bombardier Recreational Prod. Inc.*,
  876 F.3d 1350 (Fed. Cir. 2017).............................................................................35

*ART+COM Innovationpool GmbH v. Google Inc.*,
  155 F. Supp. 3d 489 (D. Del. 2016) (Andrews, J.) .............................30, 32, 33, 37

*AVM Techs., Ltd. Liab. Co. v. Intel Corp.*,
  927 F. Supp. 2d 139 (D. Del. 2013) (Andrews, J.) ........................................30, 33

*AVM Techs. Ltd. Liab. Co. v. Intel Corp.*,
  No. 10-610-RGA, 2013 WL 126233 (D. Del. Jan. 4, 2013)........................33, 35, 36

*Bai v. L & L Wings, Inc.*,
  160 F.3d 1350 (Fed. Cir. 1998)................................................................................4

*Bayer AG v. Elan Pharm. Research Corp.*,
  212 F.3d 1241 (Fed. Cir. 2000)...........................................................................4, 11

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986)...................................................................................................3

*Conopco, Inc. v. May Dep't Stores Co.*,
  46 F.3d 1556 (Fed. Cir. 1994)................................................................................14

*Cryovac Inc. v. Pechiney Plastic Packaging, Inc.*,
  430 F.Supp.2d 346 (2006) .......................................................................................26

*Daubert v. Merrell Dow Pharms., Inc.*,
  509 U.S. 579 (1993)..............................................................................................1, 26

*Eagle Pharms. Inc. v. Slayback Pharma LLC*,
  958 F.3d 1171 (Fed. Cir. 2020)........................................................................4, 5, 13

*EMC Corp. v. Pure Storage, Inc.*,
  154 F. Supp. 3d 81 (D. Del. 2016) (Andrews, J.) .................................................19

*IMS Tech., Inc. v. Hass Automation, Inc.*,
  206 F.3d 1422 (Fed. Cir. 2000)................................................................................3

*Johnson & Johnston Assoc. v. R.E. Servs. Co.*,
    285 F.3d 1046 (Fed. Cir. 2002) (en banc) ........................................................................ 4, 14

*Kahn v. Gen. Motors Corp.*,
    135 F.3d 1472 (Fed. Cir. 1998) ...................................................................................... 4

*Kumho Tire Co. v. Carmichael*,
    526 U.S. 137 (1999) ...................................................................................................... 26

*Laser Dynamics, Inc. v. Quanta Computer, Inc.*,
    694 F.3d 51 (Fed. Cir. 2012) ........................................................................................ 28

*M2M Sols. LLC v. Enfora, Inc.*,
    167 F. Supp. 3d 665 (D. Del. 2016) .............................................................................. 28

*Markman v. Westview Instruments, Inc.*,
    52 F.3d 967 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996) ............................ 4

*MAZ Encryption Techs. LLC v. Blackberry Corp.*,
    No. 13-304-LPS, 2016 WL 4490706 (D. Del. Aug. 25, 2016) ...................................... 30

*Minerva Surgical, Inc. v. Hologic, Inc.*,
    No. CV 18-00217-JFB-SRF, 2021 WL 3048447 (D. Del. July 20, 2021) ...................... 19

*Pfizer, Inc. v. Teva Pharm. USA, Inc.*,
    429 F.3d 1364 (Fed. Cir. 2005) ...................................................................................... 5

*PSC Comput. Prods., Inc. v. Foxconn Int'l, Inc.*,
    355 F.3d 1353 (Fed. Cir. 2004) ...................................................................................... 4

*Reckitt Benckiser Pharms. Inc. v. Dr. Reddy's Lab'ys S.A.*,
    No. 14-cv-1451-RGA, 2017 WL 3782782 (D. Del. Aug. 31, 2017), *aff'd sub nom. Indivior Inc. v. Dr. Reddy's Lab'ys, S.A.*, 930 F.3d 1325 (Fed. Cir. 2019) ............. 14

*SmithKline Diagnostics, Inc. v. Helena Lab. Corp.*,
    859 F.2d 878 (Fed. Cir. 1988) ...................................................................................... 3

*Sprint Commc'ns Co. LP v. Charter Commc'ns, Inc.*,
    No. 17-1734, 2021 WL 982732 (D. Del. Mar. 16, 2021) (Andrews, J.) .......... 28, 38, 39

*Sprint Commc'ns Co. LP v. Comcast IP Holdings LLC*,
    No. 12-1013-RGA, 2015 WL 456154 (D. Del. Jan. 30, 2015) (Andrews, J.) .... 35, 36, 38, 39

*Sprint Commc'ns Co. v. Time Warner Cable, Inc.*,
    760 F. App'x 977 (Fed. Cir. 2018) ................................................................................ 38

*Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*,
    520 U.S. 17 (1997) ...................................................................................................... 4

*Wonderland Switzerland AG v. Evenflo Co., Inc.*,
No. 18-cv-1990-RGA, 2021 WL 4453656 (D. Del. Sept. 29, 2021) (Andrews, J.)...................................................................................................................3, 4, 11

*Zimmer Surgical, Inc. v. Stryker Corp.*,
365 F. Supp. 3d 466 (D. Del. 2019) (Andrews, J.) ..............................................30, 32, 33, 38

**Statutes**

35 U.S.C. § 287(a) .......................................................................................................................25

**Other Authorities**

Fed. R. Civ. P. 56............................................................................................................................1, 3

Fed. R. Evid. 702 ............................................................................................................................26

## TABLE OF EXHIBITS

| Exhibit | Description |
|---|---|
| 1 | Opening Expert Report of Dr. Thomas R. Oxland dated July 21, 2021 (excerpted) |
| 2 | Deposition Transcript of Dr. Thomas Oxland taken Apr. 12, 2022 (excerpted) |
| 3 | MyKnee Surgical Technique produced as MEDACTAUSA_000014300-23 |
| 4 | Rebuttal Expert Report of Dr. Darryl D'Lima regarding Non-Infringement dated Aug. 11, 2021 (excerpted) |
| 5 | Bone Referencing Surgical Technique produced as MEDACTAUSA_000014741-76 |
| 6 | MyShoulder Surgical Technique produced as MEDACTAUSA_000016835-54 |
| 7 | Anatomic Shoulder Arthroplasty Surgical Technique produced as MEDACTAUSA_000014573-92 |
| 8 | Reverse Shoulder Arthroplasty Surgical Technique produced as MEDACTAUSA_000014525-48 |
| 9 | Reply Expert Report of Dr. Thomas Oxland regarding Infringement dated August 25, 2021 (excerpted) |
| 10 | U.S. Patent No. 9,295,482 (excerpted) |
| 11 | Deposition Transcript of Darryl D. D'Lima, M.D., Ph.D. taken Apr. 18, 2022 (excerpted |
| 12 | Expert Report of Lauren R. Kindler dated July 21, 2021 |
| 13 | Deposition Transcript of Lauren Kindler taken Apr. 26, 2022 (excerpted) |
| 14 | Medacta USA, Inc.'s Responses and Objections to Plaintiff's First Set of Interrogatories (Nos. 1-10) dated May 11, 2020 (excerpted) |
| 15 | Opening Expert Report of Dr. Darryl D'Lima regarding Marking dated July 21, 2021 (excerpted) |
| 16 | Deposition Transcript of Jeff Kogl taken June 23, 2021 (excerpted) |

# I.     NATURE AND STAGE OF THE PROCEEDINGS

In this action, plaintiff Conformis, Inc. ("Conformis") alleges that defendant Medacta USA, Inc. ("Medacta USA") infringes U.S. Patent Nos. 8,377,129 (the "'129 patent"); 8,460,304 (the "'304 patent"); 9,186,161 (the "'161 patent"); and 9,295,482 (the "'482 patent") (collectively, the "asserted patents") by making, using, offering to sell, and selling its MyKnee® and MyShoulder products, and inducing and contributing to third parties' infringement using these products. *See generally* D.I. 15.  Conformis has since narrowed its infringement allegations as follows:

| Asserted Patent | Asserted Claim | Accused Products |
| --- | --- | --- |
| '129 Patent | 6, 10, 11, 13, 16, 17, 19, 62 | Accused Knee PSI (MRI) + Accused Knee Implants |
| '304 Patent | 2 | Accused Knee PSI (MRI) + Accused Knee Implants |
|  | 3, 12 | Accused Knee PSI (CT and MRI) + Accused Knee Implants<br><br>MyShoulder Humeral Guide + Medacta Shoulder System |
| '161 Patent | 1, 2, 19 | Accused Knee PSI (CT and MRI) + Accused Knee Implants<br><br>MyShoulder Humeral Guide + Medacta Shoulder System |
|  | 12 | Accused Knee PSI (MRI) + Accused Knee Implants |
|  | 17 | Accused Knee PSI (CT and MRI) + Accused Knee Implants |
| '482 Patent | 5, 8 | Accused Knee PSI (MRI) + Accused Knee Implants |
|  | 14, 17 | Accused Knee PSI (CT and MRI) + Accused Knee Implants<br><br>MyShoulder Humeral and Glenoid Guides + Medacta Shoulder System |

Ex. 1, Oxland Rpt. ¶ 53.  The parties completed expert discovery by May 6, 2022, and this case is scheduled for trial beginning October 31, 2022.  *See* D.I. 207.

# II.     SUMMARY OF THE ARGUMENT

Medacta USA respectfully brings three motions for summary judgement under Fed. R. Civ. P. 56 and a *Daubert* motion to exclude unreliable opinions offered by Ms. Lauren Kindler.

1

*First*, Medacta USA moves for summary judgment of noninfringement of the '482 Patent claims 14 and 17.  These claims require, *inter alia*, a "block having a patient-specific surface and a guide," wherein the recited "patient-specific surface" has a "first portion" and "second portion" that are "substantially a negative of" different types of patient surfaces ("a subchondral bone surface," "an articular surface," and a "cortical bone surface").  The parties' experts agree that no single patient-specific contact surface on any accused product comprises both the claimed "first portion" and "second portion."  *Infra* III.C.1.  And Conformis's doctrine of equivalents argument seeking to encompass Medacta USA's use of small, discrete patient-specific surfaces is barred by the dedication-disclosure doctrine.  *Infra* Section III.C.2.

*Second*, Medacta USA moves for summary judgment of noninfringement of the '304 and '161 Patents.  The independent claims upon which all asserted claims depend require, *inter alia*, a surgical pin "guide hole" with a "position" ('304 Patent) or "position and/or orientation" ('161 Patent) based on anatomical information "to facilitate placement of an articular repair system when the internal surface of the mold is aligned with the joint of the patient."  But the accused MyKnee and MyShoulder guides are undisputedly removed from the patient's joint (and thus not aligned) before surgeons begin placing implant components.  *Infra* Section III.D.1.  Further, because Conformis's expert Dr. Thomas Oxland applies an incorrect interpretation of these claim limitations, his analysis of the MyKnee and MyShoulder guides when they are "aligned with" a patient's joint fails to create a genuine dispute of material fact regarding whether any surgical pin guide hole "position" or "orientation" facilitates placement of an articular repair system.  *Infra* Sections III.D.2-III.D.3.

*Third*, Medacta USA moves for summary judgment that Conformis may not recover pre-suit damages for any infringement of the '304, '161, and/or '482 Patents.  Medacta USA has

identified patent-practicing products it believes are unmarked, and Conformis has offered no contrary evidence. *Infra* Section IV.

*Fourth*, Medacta USA moves to exclude the royalty rate opinions offered by Ms. Kindler relating to damages that are inextricably intertwined with her consideration of prior Conformis litigation settlement agreements. Despite the Federal Circuit's overarching disapproval of relying upon litigation settlement agreements, Ms. Kindler unreliably adopts royalty rates from two prior Conformis settlement agreements that post-date the hypothetical negotiation date, (*infra* Section V.C.3), and does so without analyzing how litigation-related factors affected settlement value, (*infra* Section V.C.1). This unreliability is exacerbated by Ms. Kindler's cursory acknowledgement of, but failure to account for, stark differences between the scope of prior settlement agreements and the hypothetical negotiation. *Infra* Section V.C.2. The Court should therefore exclude Ms. Kindler's settlement agreement analysis and royalty rate conclusions.

## III. THE COURT SHOULD GRANT SUMMARY JUDGMENT OF NON-INFRINGEMENT REGARDING THE '482, '304, AND '161 PATENTS

### A. Legal Standard

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986), or where "there is an absence of evidence to support the nonmoving party's case," *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986), such that "no reasonable jury could find" in favor of the party opposing the motion, *IMS Tech., Inc. v. Hass Automation, Inc.*, 206 F.3d 1422, 1429 (Fed. Cir. 2000).

"The patent owner has the burden of proving infringement and must meet its burden by a preponderance of the evidence." *Wonderland Switzerland AG v. Evenflo Co., Inc.*, No. 18-cv-1990-RGA, 2021 WL 4453656, at *2 (D. Del. Sept. 29, 2021) (Andrews, J.) (citing *SmithKline

*Diagnostics, Inc. v. Helena Lab. Corp.*, 859 F.2d 878, 889 (Fed. Cir. 1988)). "A two-step analysis is employed in making an infringement determination." *Id.* at *1 (citing *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370, (1996)).

> First, the court must construe the asserted claims to ascertain their meaning and scope. The trier of fact must then compare the properly construed claims with the accused infringing product. This second step is a question of fact.

*Id.* (citing *Markman*, 52 F.3d at 976 and *Bai v. L & L Wings, Inc.*, 160 F.3d 1350, 1353 (Fed. Cir. 1998)).

"Literal infringement of a claim exists when every limitation recited in the claim is found in the accused device." *Id.* at *2 (quoting *Kahn v. Gen. Motors Corp.*, 135 F.3d 1472, 1477 (Fed. Cir. 1998)). "If any claim limitation is absent from the accused device, there is no literal infringement as a matter of law." *Id.* (quoting *Bayer AG v. Elan Pharm. Research Corp.*, 212 F.3d 1241, 1247 (Fed. Cir. 2000)). "[A] product or process that does not literally infringe upon the express terms of a patent claim may nonetheless be found to infringe if there is 'equivalence' between the elements of the accused product or process and the claimed elements of the patented invention." *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 21, 29 (1997).

"The disclosure-dedication doctrine bars application of the doctrine of equivalents . . . 'when a patent drafter discloses but declines to claim subject matter," as doing so "dedicates the unclaimed subject matter to the public." *Eagle Pharms. Inc. v. Slayback Pharma LLC*, 958 F.3d 1171, 1175 (Fed. Cir. 2020) (quoting *Johnson & Johnston Assoc. v. R.E. Servs. Co.*, 285 F.3d 1046, 1054 (Fed. Cir. 2002) (en banc). "The application of the disclosure-dedication doctrine is a question of law." *Id.* at 1177 (affirming application of doctrine in resolving Rule 12(c) motion). The doctrine bars an equivalency when "the specification discloses [that] unclaimed subject matter with 'such specificity that one of ordinary skill in the art could identify the subject matter that had been disclosed and not claimed.'" *Id.* at 1175 (quoting *PSC Comput. Prods., Inc. v. Foxconn Int'l,*

4

*Inc.*, 355 F.3d 1353, 1360 (Fed. Cir. 2004). The specification need not "disclose the allegedly dedicated subject matter in an embodiment that exactly matches the claimed embodiment"—it need only "disclose the unclaimed matter 'as an alternative to the relevant claim limitation.'" *Id.* at 1176 (quoting *Pfizer, Inc. v. Teva Pharm. USA, Inc.*, 429 F.3d 1364, 1378 (Fed. Cir. 2005)).

### B. **Factual Background**

#### 1. **MyKnee**

Conformis accuses four MyKnee product lines of infringing the '304, '161, and '482 Patents: the standard MyKnee cutting block ("Standard MyKnee"), MyKnee Ligament Balancing System ("MyKnee LBS"), MyKnee Minimally Invasive Cutting Blocks ("MyKnee MIS"), MyKnee Pin Positioning System ("MyKnee PPS"). Ex. 1, Oxland Rpt. ¶¶ 46, 53 (defining them collectively as the "Accused Knee PSI").[1] These MyKnee product lines—along with other conventional, non-patient-specific sets of instrumentation offered by Medacta USA—may be used with four different implant product lines: the Global Medacta Knee ("GMK") Primary, GMK Sphere, GMK Hinge, and GMK Revision. *Id.* ¶ 49 (defining them collectively as the "Accused Knee Implants");[2] *see also* Ex. 2, Oxland Dep. at 74:16-75:23. Dr. Oxland contends that "all of the Accused Knee Implants, as used with the Accused Knee PSI, infringe the Asserted Claims in substantially the same manner," and treats MyKnee Standard as representative of all accused MyKnee product lines. *See, e.g.*, Ex. 1, Oxland Rpt. ¶¶ 49, 174.

---

[1] Although Dr. Oxland's report mentions "MyKnee Efficiency," he later confirmed that the Efficiency instruments "are not patient-specific" themselves. Ex. 2, Oxland Dep. at 74:5-75:3.

[2] Dr. Oxland, accuses Medacta USA's implant components as the claimed "articular repair system." *See, e.g.*, Ex. 1, Oxland Rpt. ¶ 167 (referring to "the Accused Knee Implants, *i.e.*, an articular repair system"), ¶ 197 (referring to "the articular repair system, *i.e.*, Medacta Shoulder System); *see also* Ex. 2, Oxland Dep. at 71:25-72:4 (confirming he understands "articular repair system" to "include[] an implant").

MyKnee Standard offers cutting blocks for the end of the femur (thigh bone) and end of the tibia (lower leg bone), as depicted below.

| MyKnee Standard | Femoral MyKnee Standard | Tibial MyKnee Standard |
|---|---|---|
|  |  |  |
|  |  |  |

These cutting blocks have discrete patient-matched contact surfaces. Ex. 3, MEDACTAUSA_000014300 at 300; Ex. 1, Oxland Rpt. ¶¶ 333, 335 (identifying accused patient-specific surfaces for the '482 Patent with red circles). The MyKnee Standard femoral cutting block provides a "saw blade slot" for "performing the distal resection." Ex. 3, MEDACTAUSA_000014300 at 309-10. The MyKnee Standard tibial cutting block likewise provides a "saw blade slot" for "performing the tibial resection." *Id.* at 313.

The MyKnee Standard cutting blocks are "remove[d] . . . from the femur" and "from the tibia" after these initial resections occur. *Id.* at 310, 314. The surgeon then switches to conventional, non-patient-specific instrumentation to complete the surgery. The surgeon uses a "conventional 4in1 cutting block," for example, to perform an anterior cut, posterior cut, and two

6

chamfer cuts on the femur "follow[ing] the same procedure as of the Bone Referencing technique (ref.no.99.26.12ICUS)." *Id.* at 314-15; *see also* Ex. 4, D'Lima Rebuttal ¶ 103 (explaining that the "Bone Referencing technique" means "the remaining steps for actually placing and positioning the implant are the same as conventional surgeries that do not use patient specific instruments").

In total, after removing the MyKnee Standard cutting blocks "[t]he surgeon must then go through another six steps before even selecting the 'prosthesis components': '4. Extension Gap Control,' '5. Anterior Cut, Posterior Cut and Chamfers,' '6. Femoral Finishing,' '7. Tibial Finishing,' '8. Patella,' and '9. Trials.'" *Id.* ¶ 170 (citing Ex. 3, MEDACTAUSA_000014300 at 314, 316); *see also* Ex. 5, MEDACTAUSA_000014750 at 762-65, 767-68 (bone referencing technique showing that the "Femoral Finishing," "Tibial Finishing" and "Patella" steps involve further modifying patients' bones).  Implant components are installed only after selecting appropriate components. *Id.* at 769-71; Ex. 3, MEDACTAUSA_000014300 at 316.

### 2. MyShoulder

Conformis also accuses the MyShoulder products of infringing the '304, '161, and '482 Patents.  Ex. 1, Oxland Rpt. ¶ 53.  These MyShoulder products—along with other conventional, non-patient-specific sets of instrumentation offered by Medacta USA—may be used with Medacta Shoulder System implants.  Ex. 2, Oxland Dep. at 76:16-77:8.

MyShoulder offers cutting blocks for the glenoid (shoulder socket) and end of the humerus (upper arm bone), as depicted below.

| MyShoulder | MyShoulder Glenoid | MyShoulder Humeral |
|---|---|---|



These guides have discrete patient-matched contact surfaces.  Ex. 6, MEDACTAUSA_000016835 at 838; Ex. 1, Oxland Rpt. ¶¶ 358, 360 (identifying accused patient-specific surfaces for the '482 Patent with red circles and arrows).  The glenoid guide provides a guide hole for "reaming" the glenoid.  Ex. 6, MEDACTAUSA_000016835 at 848.  The humeral guide provides a "cutting plane" for a saw blade for performing the humeral resection.  *Id.* at 845.

Similar to MyKnee, MyShoulder guides are "remove[d]" from the joint after use.  *See, e.g.*, *id.* at 848.  And "[a]fter using the MyShoulder humeral and glenoid guides, the surgery must be completed according to the surgical technique prescribed for the selected shoulder implant."  *Id.* at 849.  Such techniques use conventional, non-patient-specific instrumentation to complete the surgery, including to further modify patients' bones.  *See generally*, Ex. 7, MEDACTAUSA_000014573 (technique for the "Anatomic Shoulder Prosthesis"); Ex. 8, MEDACTAUSA_000014525 (technique for "Reverse Shoulder Prosthesis").

### C.   The Accused Products Do Not Have the "Patient-Specific Surface" Recited by the '482 Patent Claims 14 and 17

#### 1.   The Accused Products Do Not Literally Infringe

There is no literal infringement of the '482 Patent claims 14 and 17 as a matter of law because the accused products lack a "patient-specific surface" meeting each of the claims' requirements.

Asserted claims 14[3] and 17 require "a block having a patient-specific surface," and that the "patient-specific surface" (i) "hav[e] a first portion" that is "substantially a negative of" either a "subchondral bone surface" (claim 13) or "articular surface" (claim 17); (ii) "hav[e] . . . a "second portion" that is "substantially a negative of a cortical bone surface; and (iii) "[be] configured to reference an osteophyte":

| '482 Patent, claim 13 | '482 Patent, claim 17 |
|---|---|
| a block having **a patient-specific surface** and a guide: | a block having **a patient-specific surface** and a guide: |
| **the patient-specific surface having** a <u>first portion configured to have a shape</u> that is substantially a negative of a subchondral bone surface of the diseased or damaged joint and | **the patient-specific surface having** a <u>first portion configured to have a shape</u> that is substantially a negative of an articular surface of the diseased or damaged joint, |
| <u>a second portion configured to have a shape</u> that is substantially a negative of a cortical bone surface of the diseased or damaged joint, | <u>a second</u> portion configured to have a shape that is substantially a negative of a cortical bone surface of the diseased or damaged joint, |
| wherein **the patient-specific surface** is <u>configured to reference an osteophyte</u> of the diseased or damaged joint; and | wherein **the patient-specific surface** is <u>configured to reference an osteophyte</u> of the diseased or damaged joint; and |

---

[3] Claim 14 depends on independent claim 13, which Conformis does not assert.

*See, e.g.*, Ex. 4, D'Lima Rebuttal ¶¶ 343, 360 (reproducing claims 13, 14, and 17).  Because the term "a patient-specific surface" provides antecedent basis for "the patient-specific surface" as recited in claims 13 and 17, the claims require "a patient-specific surface" having each recited characteristic.  *See, e.g.*, Ex. 2, Oxland Dep. at 196:20-197:2, 198:22-199:4; *see also id.* at 195:11-15, 197:17-22 (agreeing the "additional limitations . . . referring to the patent-specific surface, all specify features that the patient-specific surface of the block must have").

Conformis's expert Dr. Oxland suggests—contrary to the claims' requirements and testimony noted above—that claims 13 and 17 do not "require[] a single patient-specific surface with two portions."  *See, e.g.*, Ex. 9, Oxland Reply ¶ 234.  But in doing so, he incorrectly views the additional limitations as characteristics of the recited "block," rather than characteristics of the recited "patient-specific surface" on that block.  *See, e.g.*, Ex. 1, Oxland Rpt. ¶¶ 338, 362 (stating that "taken together" the claim limitations "require a contiguous block"); *see also* Ex. 2, Oxland Dep. at 203:10-22 (suggesting that the "combination of those four" discrete patient-specific surfaces is one "patient-specific surface" because they are "part of a contiguous block").

Notwithstanding this interpretive difference, Conformis's expert Dr. Oxland confirmed that, as a factual matter, no patient-specific contact surface on any accused product has **<u>both</u>** the recited "first portion" and the recited "second portion":

> Q.  So for each of the accused products for both MyKnee and MyShoulder, **<u>you would agree that there is no single contact surface that has both</u>** a portion that is substantially a negative of a subchondral bone surface and a portion that is substantially a negative of a cortical bone surface; correct?
>
> A.  That's correct.
>
> Q.  For each of the accused products for both MyKnee and MyShoulder, **<u>you would agree that there is no single contact surface that has both</u>** a portion that is substantially a negative of an articular surface and a portion that is substantially a negative of a cortical bone surface. Correct?
>
> A.  That's correct.

Ex. 2, Oxland Dep. at 223:12-224:2; *see also id.* 205:9-22 (agreeing he does not "offer any opinion that any one of those four contact surfaces on the MyKnee femoral cutting block has" **both** the first and second portions recited in claims 13 and 17); *id.* at 211:3-16 (same for the MyKnee tibial); *id.* at 219:11-220:1 (same for MyShoulder glenoid); *id.* at 222:14-223:11 (same for MyShoulder humeral). Dr. Oxland likewise confirmed that he accuses "**different**" patient-specific surfaces of satisfying each limitation. Ex. 2, Oxland Dep. at 202:1-13 (confirming for the MyKnee femoral cutting block that the accused cortical surfaces "are both different patient-specific surfaces than those [he] contend[s] are substantially a negative of a subchondral bone surface and substantially a negative of an articular surface"); *id.* at 209:21-210:11 (same for the MyKnee tibial cutting block); *id.* at 218:23-219:10 (same for the MyShoulder glenoid guide); *id.* at 221:16-222:2 (same for MyShoulder humeral guide). This is likewise apparent from reviewing Dr. Oxland's annotated product images in which he identifies accused patient-specific surfaces. *See* Ex. 1, Oxland Rpt. ¶¶ 333, 335 (MyKnee), 358, 360 (MyShoulder); *supra* Section III.B (reproducing said images). Medacta USA expert Dr. D'Lima agrees with that no single patient-specific surface on any accused product meets the requirements of claim 13 or claim 17. Ex. 4, D'Lima Rebuttal ¶¶ 348-51, 365 (MyKnee); *id.* ¶¶ 375-77, 390 (MyShoulder),

Thus, no issue of material fact remains—the accused products undisputedly lack a patient-specific surface meeting each requirement of claims 14 and 17. Because a "claim limitation is absent from the accused device, there is no literal infringement as a matter of law." *Wonderland Switzerland*, 2021 WL 4453656, at *2 (quoting *Bayer AG*, 212 F.3d at 1247).

### 2. The Dedication-Disclosure Doctrine Bars Conformis's Proposed Equivalency

Conformis attempts to back-stop its literal infringement argument with the doctrine of equivalents, arguing that "[w]hether an instrument contains a single patient-specific surface with

different 'portions' that satisfy claim limitations (iv), (v), and (vi)[4] or separate patient-specific surfaces that satisfy claim limitations (iv), (v), and (vi) is an insubstantial difference."  Ex. 1, Oxland Rpt. ¶¶ 338, 362; *see also* Ex. 2, Oxland Dep. at 226:6-227:13 (confirming he applies the "same Doctrine of Equivalents theory" "across both Claims 13 and 17" and "both the MyKnee and MyShoulder products").  But the dedication disclosure-doctrine bars this equivalency.

"The disclosure-dedication doctrine bars application of the doctrine of equivalents." *Eagle Pharms.*, 958 F.3d at 1175.  "[W]hen a patent drafter discloses but declines to claim subject matter, as in this case, this action dedicates that unclaimed subject matter to the public." *Johnson & Johnston Assoc.*, 285 at 1054.  To determine whether the disclosure-dedication doctrine applies, a court asks whether the specification discloses unclaimed subject matter with "such specificity that one of ordinary skill in the art could identify the subject matter that had been disclosed and not claimed." *PSC Comput. Prods., Inc. v. Foxconn Int'l, Inc.*, 355 F.3d 1353, 1360 (Fed. Cir. 2004).

Dr. Oxland and Dr. D'Lima agree that the '482 Patent's specification discloses the alternative identified by Dr. Oxland as the alleged equivalent.  Dr. Oxland, for example, confirmed that the '482 Patent at column 10, lines 27-47 discloses using a patient-specific surface that conforms to "one or more" different patient surfaces (as claimed) and using multiple "discrete" patient-specific surfaces that separately conform to the different patient surfaces (as unclaimed):

> Q.    So you agree that the '482 patent [in] this passage is describing that you might have **a single contact surface that conforms to** one or more of these articular, non-articular, or bone surfaces. Correct?
>
> A.    Yes.

---

[4] "[L]imitations (iv), (v), and (vi)" refer to the claim language "(iv) the patient-specific surface having a first portion configured to have a shape that is substantially a negative of a subchondral bone surface [or "articular surface" in claim 17] of the diseased or damaged joint and;" "(v) a second portion configured to have a shape that is substantially a negative of a cortical bone surface of the diseased or damaged joint;" and "(vi) wherein the patient-specific surface is configured to reference an osteophyte of the diseased or damaged joint; and." *See, e.g.*, Ex. 1, Oxland Rpt. at pg. 144, 146, 148, 165, 167.

> Q.    And you agree that the '482 patent in this passage is also describing that you might have **a plurality of discrete contact surfaces that separately conform to** one or more of these articular, non-articular, or bone surfaces; correct?
>
> A.    That's correct.

Ex. 2, Oxland Dep. at 231:14-232:2; *see also id.* at 228:20-231:13 (discussing this excerpt). Dr. D'Lima agrees that this passage describes the unclaimed use of "a plurality of discrete contact surfaces." Ex. 4, D'Lima Rebuttal ¶ 394. Dr. Oxland's Reply Report further notes that "the specification of the '482 patent contemplates a mold, or patient-specific surface, that is in contact with three or more surface points rather than an entire surface." Ex. 9, Oxland Reply ¶ 234; *see also* Ex. 2, Oxland Dep. at 241:4-243:4 (discussing the supporting statement at the '482 Patent, column 72, lines 31-35).

And while Dr. Oxland and Dr. D'Lima focus on those two passages, the '482 Patent's other disclosures likewise merit applying the dedication-disclosure doctrine. *See, e.g., Eagle Pharms.*, 958 F.3d at 1177 ("Expert testimony is not always required for a district court to determine how a skilled artisan would understand a patent's disclosure and claimed invention."). The '482 Patent introduces patient-specific instruments as having "one or more surfaces" that "conform . . . to the shape of the articular surfaces of the joint." Ex. 10, '482 Patent at 8:65-9:2. It similarly states that the "surgical tool includes a template" that "has at least one contact surface for engaging [and substantially conforming with] a surface associated with a joint." *Id.* at 9:56-60. The '482 Patent further explains that "the surface may be an articular surface, a non-articular surface, a cartilage surface, a weight bearing surface, a non-weight surface and/or a bone surface," (*id.* at 9:63-66), and that "a first piece" of the template may "include[] one or more of the at least one contact surfaces," which may be provided as "a plurality of discrete contact surfaces," (*id.* at 10:1-7).

13

The '482 Patent's disclosures are comparable to those at issue in *Johnson* and those considered by this Court in *Reckitt Benckiser Pharms. See Johnson*, 285 F.3d at 1055 (finding that the specification disclosed "steel substrates" as an alternative to the "preferred" aluminum substrate claimed); *Reckitt Benckiser Pharms. Inc. v. Dr. Reddy's Lab'ys S.A.*, No. 14-cv-1451-RGA, 2017 WL 3782782, at *4 (D. Del. Aug. 31, 2017) ("Here, there is a portion of the specification where HCPs and PVP are listed as examples of useful water-soluble film-forming polymers. PVP is akin to steel and HCP is akin to aluminum."). Permitting Conformis to advance its equivalency—which ignores the claims' requirement of "a patient-specific surface" with specifically-identified characteristics—would "erase 'meaningful structural and functional limitations of the claim on which the public is entitled to rely in avoiding infringement.'" *Johnson*, 285 F.3d at 1054 (quoting *Conopco, Inc. v. May Dep't Stores Co.*, 46 F.3d 1556, 1562 (Fed. Cir. 1994)). The Court should therefore apply the dedication-disclosure doctrine to find no infringement as a matter of law.

### D.   The Accused Products Do Not Have a "Guide Hole" for a Surgical Pin With a Position or Orientation "to Facilitate the Placement of an Articular Repair System When the Mold Is Aligned with the Joint of the Patient"

There is also no literal infringement of the '304 and '161 Patents as a matter of law because the accused products do not meet the requirements recited for the "guide holes for surgical pins."

The asserted claims of the '304 and '161 Patents depend upon '304 Patent claim 1 and '161 Patent claims 1 and 19. Claim 1 of the '304 and '161 Patents each require an instrument with "two or more guide holes, each configured to guide a surgical pin," "at least one" of which has a "position" ('304 Patent) or "position and/or orientation" ('161 Patent) based on "anatomical information." These independent claims further require that the guide hole "position" or "orientation" "**facilitate the placement of an articular repair system**" at a particular time: "when the internal surface of the mold is aligned with the joint of the patient." The '161 Patent claim 19

14

similarly recites that the "position and/or orientation . . . <u>includes</u> anatomical information" and that facilitation occurs "when the internal surface of the mold is aligned with <u>and substantially conforms to the shape of</u> the joint of the patient."[5]

| '304 Patent, claim 1 | '161 Patent, claim 1 | '161 Patent, claim 19 |
|---|---|---|
| Wherein at least one of the two or more guide holes **has a position** based on anatomical information of the joint of the patient <u>to facilitate the placement of an articular repair system when the internal surface of the mold is</u> aligned with the joint of the patient, | Wherein at least one of the two or more guide holes **has a position and/or orientation** based on anatomical information of the joint of the patient <u>to facilitate the placement of an articular repair system when the internal surface of the mold is</u> aligned with the joint of the patient, | Wherein **the position and/or orientation** of at least one of the two or more guide holes includes anatomical information of the joint of the patient <u>to facilitate the placement of an articular repair system when the internal surface of the mold is aligned with and substantially conforms to</u> the shape of joint of the patient, |

*See, e.g.*, Ex. 4, D'Lima Rebuttal ¶¶ 146, 207, 209, 241 (reproducing these claims).

Conformis accuses the MyKnee femoral and tibial cutting blocks and the MyShoulder humeral guide of infringing the '304 and '161 Patent. Ex. 1, Oxland Rpt. ¶ 53. Dr. Oxland identifies the accused "guide holes" for surgical pins using three images from the MyKnee Standard and MyShoulder surgical techniques:

---

[5] According to Conformis, these differences are not material. *See, e.g.*, Ex. 1, Oxland Rpt. ¶ 276 (relying upon prior analysis of the '161 Patent claim 1).



*Id.* ¶¶ 164-66, 226-227, 275 (MyKnee), 195, 246 (MyShoulder); *see also* Ex. 2, Oxland Dep. at 78:10-16, 79:23-80:4 (confirming he relies upon these images for MyKnee).[6]

But there is a genuine dispute of material fact regarding whether the "position" or "orientation" of any accused guide hole facilitates placement of an articular repair system when the Accused PSI is aligned with the patient's joint. *First*, the Accused PSI guide hole "position" or "orientation" does not "facilitate placement of an articular repair system" as claimed because surgeons remove the Accused PSI from the patient's joint (i.e., it is no longer "aligned with" the joint) long before they place implant components.[7] *Second*, Dr. Oxland uses an incorrect claim interpretation when analyzing how Accused PSI are used earlier in surgery, and thus fails to

---

[6] Dr. Oxland does not explain his specific contentions regarding pin holes on the MyKnee LBS, MyKnee MIS, and MyKnee PPS products other than to generally state that they "are very similar," offer conclusory assertions that they satisfy each claim element, and string-cite their surgical techniques. *See, e.g.*, Ex. 1, Oxland Rpt. ¶¶ 174, 177-78.

[7] Solely to present this argument concisely, Medacta USA assumes that Dr. Oxland's characterization of the Medacta USA implant components as "articular repair systems" is correct. However, this remains a disputed issue on which the parties' experts disagree. *See, e.g.*, Ex. 4, D'Lima Rebuttal ¶ 46 ("An implant is part of a *replacement* system, not a *repair* system.").

16

establish that the "position" or "orientation" of an accused guide hole bears any relation to—much less facilitates—placing implant components.

### 1. Surgeons Do Not Use the Accused PSI When Placement of Implant Components Occurs

The MyKnee and MyShoulder instruments are used "at an early stage of surgery when the joint is unresected, and thus not prepared to receive any implant." Ex. 4, D'Lima Rebuttal ¶¶ 170, 219 (MyKnee), ¶ 269 (MyShoulder). As Dr. D'Lima explained for MyKnee Standard:

> Surgical pins are placed through the guide holes before any resections take place. And the surgical pins are removed immediately after the resections guided by the Standard MyKnee instruments. The surgeon must then go through another six steps before even selecting the "prosthesis components": "4. Extension Gap Control," "5. Anterior Cut, Posterior Cut and Chamfers," "6. Femoral Finishing," "7. Tibial Finishing," "8. Patella," and "9. Trials." **Only then—seven additional steps after the surgical pins have been removed—does placement of implant components occur**.

*Id.* ¶ 170 (citing Ex. 3, MEDACTAUSA_000014300). The surgical techniques for the remaining Accused Knee PSI and MyShoulder humeral guide likewise involve a substantial temporal gap between removing the Accused PSI from the joint after use and placing implant components. *See, e.g.*, Ex. 4, D'Lima Rebuttal ¶ 185 (MyKnee), ¶ 269 (MyShoulder); Ex. 6, MEDACTAUSA_000016835 at 16849 ("After using the MyShoulder humeral and glenoid guides, the surgery must be completed according to the surgical technique prescribed for the selected shoulder implant.").

Dr. Oxland agrees that the claimed facilitation must occur "when the guide is on the -- on the patient's joint." Ex. 2, Oxland Dep. at 125:21-126:2; *see also id.* at 126:6-14 (confirming he applied this understanding in his opinions). And he does not dispute that the surgical techniques for all accused products require removing the Accused PSI long before implant component placement occurs. Ex. 2, Oxland Dep. at 123:16-22 (confirming he "do[es]n't disagree" that "the MyKnee cutting blocks are removed from the patient's joint long before the surgeon actually

17

places any implant components."); *id.* at 141:23-142:2 (agreeing that "placement of an articular repair system occurs after the MyShoulder humeral guide has been removed from a patient's joint").

Conformis therefore lacks any evidence that the guide holes for surgical pins—much less their "position" or "orientation"—facilitate placement of an articular repair system. Because the Accused PSI are undisputedly removed from a patient's joint long before implant component placement occurs, the guide holes are not present for their "position" or "orientation" to "facilitate placement of an articular repair system." This reason alone merits summary judgment of non-infringement.

> **2.    Dr. Oxland Applies an Incorrect Claim Interpretation When Analyzing the Accused PSI's Function when "Aligned With" a Patient's Joint**

Seemingly ignoring this temporal gap between Accused PSI use and implant component placement, Dr. Oxland analyzes how the Accused PSI operate when used earlier in the surgical procedure when surgeons are not placing implant components. But his analysis applies an incorrect understanding of the asserted claims. According to Dr. Oxland, "the internal surface of the mold"—not the "position" or "orientation" of the "guide holes"—must "facilitate placement of an articular repair system":

> I understand this claim limitation to mean that **the internal surface of the mold**, when aligned with the patient's joint, **facilitates placement of the articular repair system**. In other words, the purpose of the internal surface of the mold being aligned with the joint of the patient is to facilitate the placement of the articular repair system."

Ex. 9, Oxland Reply ¶ 134. Dr. Oxland confirmed that he applied this understanding in reaching his opinions. Ex. 2, Oxland Dep. at 125:8-20 (Q. "So the internal surface of the mold facilitates, and that facilitation occurs when the internal surface of the mold is aligned with the patient's joint.

That's your understanding of the claim language?" A. "That's correct."); *id.* at 126:6-14 (confirming he applied this understanding in coming to his opinions).

Dr. Oxland's interpretation cannot be reconciled with the claim language. The claims at issue recite that the "position" or "orientation" of the guide hole facilitates, not the "internal surface of the mold":

- "wherein at least one of the two or more guide holes **has a position [and/or orientation]** . , , **to facilitate** the placement of an articular repair system" ('304 and '161 Patents claim 1);

- "wherein **the position and/or orientation** of at least one of the two or more guide holes includes anatomical information of the joint of the patient **to facilitate** the placement of an articular repair system" ('161 Patent claim 19).

Tellingly, when shown the claim language at his deposition, Dr. Oxland agreed that the guide hole "position" or "orientation" must facilitate. Ex. 2, Oxland Dep. at 118:18-119:8 ('304 Patent claim 1); *id.* at 120:4-15 ('161 Patent claim 1); *id.* at 120:19-121:4 ('161 Patent claim 19).

To the extent Dr. Oxland's analysis of this claim limitation assesses facilitation by the "internal surface of the mold"—an "impermissible" interpretation based on claims' plain language—it is irrelevant and properly excludable. *See EMC Corp. v. Pure Storage, Inc.*, 154 F. Supp. 3d 81, 98-99 (D. Del. 2016) (Andrews, J.) (excluding expert testimony suggesting, contrary to the Court's prior construction, that the claim included other limitations); *Minerva Surgical, Inc. v. Hologic, Inc.*, No. CV 18-00217-JFB-SRF, 2021 WL 3048447, at *9 (D. Del. July 20, 2021) ("[O]pinions and conclusions that are based on a faulty claim construction are irrelevant [and] would confuse the jury."). Any such improper analysis likewise provides no basis for denying summary judgment. *EMC Corp.*, 154 F. Supp. 3d at 99 (finding expert's application of improper construction did not establish a genuine dispute of material fact).

**3.    When the Accused PSI Is "Aligned With" a Patient's Joint, No Guide Hole "Position" or "Orientation" "Facilitate[s] Placement of an Articular Repair System"**

Dr. Oxland's analysis of the Accused PSI under this incorrect claim interpretation addresses the wrong issue, and thus fails to establish a genuine dispute of material fact regarding the disputed limitations.  Dr. Oxland does not squarely analyze whether the "position" or "orientation" of any surgical pin hole on the Accused PSI "facilitates placement of an articular repair system when the internal surface of the mold is aligned with the joint of the patient."  Dr. Oxland concludes merely that the "pinholes"—but not necessarily their "position" or "orientation"—"are **an important feature** of the cutting block in preparation for implant placement."  *See, e.g.*, Ex. 1, Oxland Rpt. ¶ 168 (discussing '304 Patent claim 1 and MyKnee); *id.* ¶ 199 (discussing '304 Patent claim 1 and MyShoulder); *see also id.* ¶¶ 217, 230, 250, 276 (providing virtually the same analysis for the '304 Patent claim 12 and '161 Patent claims 1 and 19).  But a surgical pin guide hole being an "important feature" in an early surgical step does not mean its "position" or "orientation" facilitates placement of an articular repair system later.

**a.    The Accused Guide Holes' Fixation Function Does Not Evince the Claimed Facilitation**

Dr. Oxland first argues that the "pinholes" are "important" because they are used to "fix the cutting blocks to the patient's joint so that the blocks are properly aligned to prepare the joint for implant placement and to perform the surgical procedure."  Ex. 1, Oxland Rpt. ¶ 168; *see also id.* ¶ 199 (same for MyShoulder humeral); *see also* Ex. 2, Oxland Dep. at 127:5-14, 127:20-128:1 (confirming this "fixation function" is "performed when the MyKnee guide is actually aligned with the joint of the patient").  The undisputed evidence, however, shows that the Accused PSI are placed in proper alignment without using any guide holes.  The Accused PSI are "positioned

manually" on the joint in proper alignment using their patient-specific surfaces.[8]    Ex. 3, MEDACTAUSA_000014300 at 308, 311 ("Considering the anatomical shape of the block, only one orientation is possible.").  Ex. 6, MEDACTAUSA_00016835 at 845 ("Place the MyShoulder humeral guide on the humeral head rim.  Due to the anatomical shape of the guide, only one orientation is truly stable.").  The Accused PSI are thus "placed in proper alignment before fixation pins are advanced through the guide holes."  Ex. 2, Oxland Dep. at 128:14-129:19 (discussing MyKnee); *id.* at 140:22-141:7 (agreeing that "the K-wires are not used to fix the humeral guide to the humerus until after the humeral guide is already oriented and aligned properly with respect to the joint").  And surgical pins are only advanced through the accused guide holes "[o]nce the positioning is deemed satisfactory." *See, e.g.*, Ex. 3, MEDACTAUSA_000014300 at 309 ("Once the positioning is deemed satisfactory, the distal cutting block can be fixed on the femur . . . by use of standard 3.2 mm diameter pins."); *id.* at 312 (similar statement regarding MyKnee tibial); Ex. 6, MEDACTAUSA_00016835 at 845 (similar statement regarding MyShoulder humeral). The accused guide holes' positions and orientations therefore have no bearing on attaining proper cutting guide alignment.

Dr. Oxland's reference to the guide holes' fixation function further fails to either (i) explain how fixation in an early surgical step qualifies as "facilitat[ing] placement of an articular repair system"; or (ii) provide evidence showing that the guide hole "positions" and "orientations" are necessary for achieving that fixation.  *See, e.g.*, Ex. 2, Oxland Dep. at 130:19-23 (agreeing he did not "offer any opinions that fixation would not be able to be achieved for the MyKnee femoral and

---

[8] In other words—and non-coincidentally given Dr. Oxland's incorrect focus on facilitation by "the internal surface of the mold"—the patient-specific surfaces align the Accused PSI on the joint. Ex. 4, D'Lima Rebuttal ¶ 171 ("The surgical technique makes clear that the "anatomical shape of the block"—not the guide holes—determines the Standard MyKnee instruments' placement."), ¶ 270 (same for the MyShoulder humeral guide).

tibial cutting blocks if the positions and orientations of the guide holes were -- were different"); *id.* at 141:8-22 (offering similar testimony for MyShoulder).  Regarding the latter, Dr. Oxland declined to provide evidence in reply notwithstanding Dr. D'Lima's rebuttal opinions noting that certain guide hole positions or orientations are not important for achieving fixation.  Ex. 4, D'Lima Rebuttal ¶ 171 (noting that "the surgeon need only use *some* of the guide holes" in the MyKnee Standard technique), ¶ 270 (discussing MyShoulder); Ex. 2, Oxland Dep. at 137:2-25, 138:13-19 (confirming he did not provide contrary opinions for MyKnee); *id.* at 143:22-144:2 (same for MyShoulder); *see also* Ex. 11, D'Lima Dep. at 249:1-250:14 (explaining that "the fixation pins don't have to have any relationship, any preconfigured relationship to the patient's anatomy or the patient's articular surface" because "the fixation of the guide has – doesn't have -- may not have anything to do with the direction of your saw blade").

Thus, the "fixation function" identified by Dr. Oxland does not create a genuine dispute of material fact regarding whether any guide hole's "position" or "orientation" "facilitates placement of an articular repair system when the internal surface of the mold is aligned with the joint of the patient."  No guide hole in any accused product does so, and there is no literal infringement.

### b.    Later Surgical Activities Do Not Evince the Claimed Facilitation

Dr. Oxland also argues that the "pinholes" on the MyKnee femoral and tibial cutting blocks are "important" because certain surgical pins may sometimes be used for fixation and "reference [of] additional instruments" if necessary, namely a conventional femoral "4-in-1 cutting block" and a conventional tibial cutting block for "tibial recut[s]."[9]  Ex. 1, Oxland Rpt. ¶ 168.  But the

---

[9] Dr. Oxland does not advance a similar argument for the MyShoulder humeral guide.  Ex. 2, Oxland Dep. at 142:3-8 (agreeing he "do[es]n't offer any opinion that surgical pins placed through the MyShoulder humeral guide holes are used for subsequent surgical steps that occur in between the humeral resection and placement of the selected implant").

MyKnee surgical technique "requires removing" the MyKnee cutting blocks before placing the '4in1 cutting block'" or performing "[a]ny recuts using conventional cutting blocks." Ex. 4, D'Lima Rebuttal ¶ 172 (citing Ex. 3, MEDACTAUSA_000014300 at 310, 314).  As Dr. Oxland confirmed, these subsequent activities therefore occur when the Accused PSI is **not aligned** with a patient's joint.  Ex. 2, Oxland Dep. at 136:9-14 (agreeing that "whenever surgeons perform subsequent cuts using either the 4-in-1 guide or a conventional guide for a recut, the MyKnee femoral and tibial blocks are no longer aligned with the joint of the patient"); *see also id.* at 132:8-12 (discussing MyKnee femoral); *id.* at 136:3-8 (discussing MyKnee tibial).  As such, these subsequent surgical steps do not evidence the claimed facilitation, which must occur "when the internal surface of the mold is aligned with the joint of the patient."

Dr. Oxland's analysis of these subsequent surgical steps also improperly conflates the accused guide holes with other MyKnee holes.  For example, the femoral guide holes Dr. Oxland accuses (below left) are different than those used to "prepare the holes for the 4in1 cutting block fixation using the dedicated drills" (below right).  *Compare* Ex. 1, Oxland Rpt. ¶ 164, *with* Ex. 3, MEDACTAUSA_000014300 at 309-10; *see also* Ex. 2, Oxland Dep. at 133:8-13 (agreeing the 4-in-1 reference holes "are different holes than the pin holes used to fix the MyKnee femoral guide to the joint").



This difference matters—surgical pins are not introduced through the holes shown in Image 11. Ex. 3, MEDACTAUSA_000014300 at 310 ("Before removing the MyKnee distal block, prepare the holes for the 4in1 cutting block fixation using the dedicated drills."); *id.* at 314 ("**After the MyKnee distal block has been removed from the femur**, position the anterior referenced parallel pins in the corresponding holes . . . ."). The "central hole of the tibial block" mentioned by Dr. Oxland similarly is not one of the accused guide holes through which a surgical pin is advanced to fix the tibial cutting block to the joint. *Compare* Ex. 1, Oxland Rpt. ¶¶ 169, 229. *with* Ex. 3, MEDACTAUSA_000014300 at 313 ("To guarantee a stable fixation two **parallel pins** plus an **oblique one** must be used.").

*    *    *

For these reasons, Dr. Oxland's opinions fail to establish any genuine dispute of material fact regarding whether any accused guide hole's "position" or "orientation" "facilitate[s] the placement of an articular repair system when the internal surface of the mold is aligned with the joint of the patient." Because this requirement is found in each independent claim upon which the

asserted '304 and '161 Patent claims depend, the Court should grant summary judgment of non-infringement as to both patents across all accused products.

## IV.    THE COURT SHOULD GRANT SUMMARY JUDGMENT OF NO PRE-SUIT DAMAGES FOR THE '304, '161, AND '482 PATENTS BECAUSE CONFORMIS FAILED TO MARK PRODUCTS

"Pursuant to 35 U.S.C. § 287(a), a patentee who makes or sells a patented article must mark his articles or notify infringers of his patent in order to recover damages." *Arctic Cat Inc. v. Bombardier Recreational Prod. Inc.*, 876 F.3d 1350, 1365 (Fed. Cir. 2017). "The patentee bears the burden of pleading and proving he complied with § 287(a)'s marking requirement." *Id.* at 1366. An "alleged infringer . . . bears an initial burden of production to articulate the products it believes are unmarked 'patented articles' subject to § 287." *Id.* at 1368 ("To be clear, this is a low bar.").

Here, Medacta USA identified (i) the iTotal CR and PS systems as potential patent-practicing products for the '304, '161, and '482 Patents; and (ii) the iUni and iDuo systems as potential patent-practicing products for the '304 and '161 Patents that Conformis failed to mark over the pre-suit damages period. *See generally* Ex. 14, Supp. Resp. to Interrog. No. 10 at 46 ("Conformis does not appear to mark its iTotal, iUni, or iDuo products with either the '304 or '161 Patent, and does not mark its iTotal products with the '482 Patent."); *see also* Ex. 15, D'Lima Marking Rpt. ¶¶ 44-83.

Conformis has not offered any evidence that the iTotal, iUni, or iDuo products do not practice the corresponding asserted patents, or that Conformis substantially and continuously marked these products during the pre-suit damages period. *See, e.g.*, Ex. 2, Oxland Dep. at 35:22-36:1 ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆); *id.* at 39:3-8 (confirming he "offered no opinion suggesting that Conformis's products do not practice the '161 and '304 patents"); *id.* at 40:8-12 (confirming "it's [his] understanding t▆▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆).

Summary judgment of no pre-suit damages regarding the '304, '161, and '482 Patents is therefore appropriate. Indeed, Medacta USA does not believe Conformis disputes this issue. *See, e.g.*, D.I. 222 at n. 1 (describing correspondence with Conformis's counsel confirming Conformis "does not contend that all products were marked with the '304, '161, and '482 patents"); Hr'g Tr. (May 24, 2022) at 6:13-19 (indicating agreement to that footnote's representations).

## V.    THE COURT SHOULD EXCLUDE OPINIONS OFFERED BY MS. KINDLER

### A.    Legal Standard

An expert witness may provide opinion testimony only if "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. Rule 702 requires a district court to make a preliminary determination, when requested, as to whether the requirements of the rule are satisfied as to a particular expert's proposed testimony. *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592-93 (1993); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999). "The party offering the expert testimony has the burden of proving admissibility." *Cryovac Inc. v. Pechiney Plastic Packaging, Inc.*, 430 F.Supp.2d 346 (2006) (citing *Daubert*, 509 U.S. at 592, n.10). Pursuant to Rule 702, Medacta USA respectfully moves to exclude Ms. Kindler's *Georgia-Pacific* reasonable royalty rate opinions because the settlement agreements upon which she relies are not comparable to the hypothetical negotiation.

### B.    Factual Background

Conformis's damages expert, Ms. Lauren Kindler, opined that the proper form of damages in this case is a reasonably royalty. Ex. 12, Kindler Op. Rpt. at pg. 4. For purposes of her analysis, Mr. Kindler testified that the hypothetical negotiation between Conformis and Medacta USA

would have occurred in February 2013, which corresponds to the earliest issuance date of any of the Asserted Patents. *Id.* When selecting her royalty rate, however, Ms. Kindler relied on seven settlement and license agreements that Conformis negotiated with non-parties between 2015 to 2021 (*i.e.*, 2-to-8 years after the date of the hypothetical negotiation). *Id.* at pp. 50-71. In particular, Ms. Kindler discussed—to varying degrees—agreements between Conformis and MicroPort, Wright, Smith & Nephew, Zimmer, Paragon 28, and Stryker (in 2019 and 2021). *Id.*; *see also id.* at pg. 62 (Table 8 summarizing settlement agreements); Ex. 13, Kindler Dep. Tr. at 230:20-232:19.

While Ms. Kindler relies on each agreement, she principally focuses on four of the seven when determining her royalty rate, namely the: (1) 2015 Conformis-MicroPort Agreement; (2) 2018 Conformis-Smith & Nephew Agreement; (3) 2020 Conformis-Zimmer Agreement; and (4) 2021 Conformis-Stryker Agreement (collectively, "the Settlement Agreements").[10] *See id.*, ¶¶ 13.i.-l., 120.e.-h., 124.c-d. Each of these Settlement Agreements was negotiated in the context of litigation and involved different economic considerations, such as worldwide licenses, cross licenses, covenants, and releases. *See* Ex. 13, Kindler Dep. Tr. at 96:22-97:2 (Conformis-MicroPort), 143:4-7 (Conformis-Smith & Nephew), 158:18-22 (Conformis-Zimmer), 191:10-13 (2021 Conformis-Stryker).

Despite the differences between the licenses at issue in the Settlement Agreements and during the hypothetical negotiation, Ms. Kindler adopted the **same** running royalty rates for

---

[10] Ms. Kindler dismissed the 2019 Conformis-Stryker agreement based on its "complexities." Ex. 12, Kindler Op. Rpt. ¶ 82; *see also* Ex. 13, Kindler Dep. Tr. at 231:20-23. She similarly concluded that "the Conformis-Wright agreement and the Conformis-Paragon 28 agreement would be less probative as to the royalty payment that Conformis and Medacta would agree upon for a license to the Patents-in-Suit at the time of the hypothetical negotiation." Ex. 12, Kindler Op. Rpt. ¶ 83.a; *see also id.* at n. 289 (same).

Medacta USA's knee and shoulder products as used in two of those settlement agreements.  For Medacta USA's MyKnee products, she opined that "the ███████████ under the Conformis - MicroPort agreement would be a reasonable and conservative indicator of the value that Conformis and Medacta would place at a license for to the Patents-in-Suit for knee products."  Ex. 12, Kindler Op. Rpt., ¶ 13.  For Medacta USA's MyShoulder products, Ms. Kindler similarly opined  that "the ███████████ under the Conformis - Stryker Corporation (2021) agreement would be a conservative indicator of the value that Conformis and Medacta would place at a license for to the Patents-in- Suit for shoulder products."  *Id.*  Ms. Kindler then adopted these same ███████████ ████████████████████████████ for Medacta USA.  *Id.*, ¶ 14.  As to the Smith & Nephew and Zimmer settlement agreements, Ms. Kindler listed several "similarities and differences" for these settlement agreements before generically concluding "both [are] indicative of the value embodied in the patented technology and demonstrate[] that large market players have paid substantial license fees for a license to Conformis's patents . . . ."  *Id.*, ¶¶ 89-93.

C.    **Ms. Kindler's Hypothetical Negotiation Construct is Impermissibly Predicated on Non-Comparable Settlement Agreements**

The Federal Circuit has recognized a "longstanding disapproval of relying on settlement agreements to establish reasonable royalty damages."  *Sprint Commc'ns Co. LP v. Charter Commc'ns, Inc.*, No. 17-1734, 2021 WL 982732, at *10 (D. Del. Mar. 16, 2021) (Andrews, J.) (quoting *Laser Dynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 77 (Fed. Cir. 2012)).  "Similarly, this Court has observed that 'Federal Circuit precedent is hostile toward using litigation settlement agreements in proving a reasonable royalty, except in limited circumstances.'"  *Id.* (quoting *M2M Sols. LLC v. Enfora, Inc*., 167 F. Supp. 3d 665, 678 (D. Del. 2016)).  That is because "[t]here is minimal probative value in using litigation settlements to calculate a reasonable royalty, as the settlement agreement is not comparable to a negotiation between two willing parties."  *Id.*

As discussed herein, Ms. Kindler's opinions and testimony addressing the Conformis Settlement Agreements should be excluded because: (i) she failed to analyze the litigation-related factors that would have affected the value of the Settlement Agreements; (ii) she failed to account for significant economic differences between the license sought during the hypothetical negotiation and the licenses obtained in the later-in-time Settlement Agreements; and (iii) the Settlement Agreements occurred between 2-to-8 years after the date of the hypothetical negotiation.

Additionally, because Ms. Kindler's royalty rate conclusion is inextricably intertwined with her consideration of the Settlement Agreements, her conclusions as to particular royalty rates must be excluded as well.  *See, e.g.*, Ex. 12, Kindler Op. Rpt. ¶ 79, (identifying her premise that "Conformis would have sought to negotiate a running royalty payment at the time of the hypothetical negotiation" under the heading "Implications of Conformis's License Agreements"); *id.* ¶ 88 (adopting "███████████████ from the Conformis - Microport agreement as "probative as to the royalty payment that Conformis and Medacta would have considered for a license to the Patents-in-Suit at the hypothetical negotiation relating to knee products"); *id.* ¶ 85 (adopting "██████████ under the Conformis - Stryker Corporation (2021) agreement" as an "indicator of the value that Conformis and Medacta would place at a license for to the Patents-in-Suit for shoulder products"); *id.* ¶¶ 124-25 (adopting these same royalty rates as the "outcome of the hypothetical negotiation").

### 1.    Ms. Kinlder Failed to Analyze Factors Affecting the Value of Settlement for the Non-Comparable Settlement Agreements

Ms. Kindler's royalty rate analysis should be excluded because she relies on the Settlement Agreements without analyzing the litigation-related factors that would have affected the value of the settlements therein.  Each Settlement Agreements was "made in the context of settling a

litigation dispute, and thus did not reflect the royalty the parties would have reached just before infringement began." *Zimmer Surgical, Inc. v. Stryker Corp.*, 365 F. Supp. 3d 466, 496 (D. Del. 2019) (Andrews, J.) (quoting *MAZ Encryption Techs. LLC v. Blackberry Corp.*, No. 13-304-LPS, 2016 WL 4490706, at *1 (D. Del. Aug. 25, 2016)).  To show that any such settlement agreement is economically comparable, an expert must actually analyze the litigation-related factors that affect the value of the underlying settlement and how those factors relate to the hypothetical negotiation. *See AVM Techs., Ltd. Liab. Co. v. Intel Corp.*, 927 F. Supp. 2d 139, 143-44 (D. Del. 2013) (Andrews, J.).  Such factors include, for example, "the amount of damages ultimately sought in the litigation," whether "the issue of willfulness" would "have been tried," whether there was "the possibility of treble damages," whether sanctions had been imposed, the nature of the "underlying negotiations…or the context in which the settlement agreement was reached," "the defenses available to [the defendant] at trial," and "the strength of those defenses." *See id.* at 143-145.  Another factor may be the effect of fixed payments in addition to the royalty rate. *Zimmer*, 365 F. Supp. 3d at 496.  Without analyzing these litigation-related factors, Ms. Kindler's dependence on the Settlement Agreements is unreliable. *See also Id.* ("Dr. Vellturo engages in no analysis of the underlying litigation and how it may have affected the royalty rate."); *ART+COM Innovationpool GmbH v. Google Inc.*, 155 F. Supp. 3d 489, 511-12 (D. Del. 2016) (Andrews, J.) ("For the five settlement licenses, Mr. Reed fails to undertake any analysis of the underlying litigation that led to the settlement.").

Ms. Kindler admittedly failed to analyze the litigation-related factors discussed above. During her deposition, she admitted she did not analyze the strength of defenses that would have been available to the defendants at trial with Conformis. Ex. 13, Kindler Dep. Tr. at 110:17-111:1, 112:3-11, 112:15-20 (Conformis-MicroPort Settlement Agreement); *see id.* at 144:1-146:18

30

(Conformis-Smith & Nephew Settlement Agreement); *id.* at 160:17-162:4 (Conformis-Zimmer Settlement Agreement); *id.* at 191:14-192:2, 193:2-20 (2021 Conformis-Stryker Settlement Agreement). She likewise did not analyze the amount of damages sought in the underlying litigation. *Id.* at 112:21-113:6 (Conformis-MicroPort Settlement Agreement); *id.* at 146:19-25 (Conformis-Smith & Nephew Settlement Agreement); *id.* at 162:5-11 (Conformis-Zimmer Settlement Agreement); *id.* at 193:21-25 (2021 Conformis-Stryker Settlement Agreement). Nor did she analyze whether willful infringement was at issue or whether any sanctions had been imposed in the case. *Id.* at 113:7-23 (Conformis-MicroPort Settlement Agreement); *id.* at 148:4-9 (Conformis-Smith & Nephew Settlement Agreement); *id.* at 162:25-163:6 (Conformis-Zimmer Settlement Agreement); *id.* at 194:14-20 (2021 Conformis-Stryker Settlement Agreement). And she further failed to analyze the possibility of treble damages in each of the cases leading to the Settlement Agreements. *See id.* at 113:12-17 (Conformis-MicroPort Settlement Agreement), 147:7-17 (Conformis-Smith & Nephew Settlement Agreement), 162:18-24 (Conformis-Zimmer Settlement Agreement), 194:6-13 (2021 Conformis-Stryker Settlement Agreement).

Additionally, each Settlement Agreement involved ███████████████████ ████████████████████ *See* Ex. 12, Kindler Op. Rpt. at pg. 62 (Table 8). Yet Ms. Kindler does not provide any analysis indicating how the parties reached the particular ███████ ███████ or any Settlement Agreement, or how that affected the royalty rate. Ex. 13, Kindler Dep. Tr. at 118:6-15 (Conformis-MicroPort Settlement Agreement); *see also* Ex. 12, Kindler Op. Rpt. at ¶¶ 13.h., 13.l., 78, 85, 87.c., 89.c., 90, 93, 120.d., 120.g., 124.d. She also failed to analyze the nature of the underlying negotiations or the context in which each Settlement Agreement was reached. For example, Ms. Kindler emphasized the 2015 Conformis-MicroPort Settlement Agreement as "the most relevant to determining the outcome of the hypothetical

31

negotiation." Ex. 12, Kindler Op. Rpt., ¶ 87.  She even adopted the ███████████████ as agreed into in the Conformis-MicroPort Settlement Agreement for Medacta USA's MyKnee products.  But when asked to identify where in her reports she cited evidence indicating how the parties arrived at ████████████ in the 2015 Conformis-MicroPort Settlement Agreement, Ms. Kindler could only say her "report speaks for itself."  Ex. 13, Kindler Dep. Tr. at 120:1-121:24. She also generically pointed to pages 51, 52, and 66 of her opening report—none of which explained how the parties arrived at ██████████ for the 2015 Conformis-MicroPort Settlement Agreement.  *Compare id. with* Ex. 12, Kindler Op. Rpt. at pp. 51-52, 66.  Given this utter lack of analysis, Ms. Kindler could not explain why the parties did not agree to, for example, ██████████ █████████████████████████████████████ which they ultimately agreed.  *See* Ex. 13, Kindler Dep. Tr. at 123:15-124:16.  In Ms. Kindler's view, the only relevant inquiry is "what the parties have agreed to for licenses to the patents-in-suit or other comparable . . . patents."  *Id.* at 134:9-16. In other words, she focused on purported technological comparability of a subset of the **underlying patents** and did not analyze the litigation-related facts that contributed to the selection of the **royalty rate**.  This renders her opinions unreliable.  *Zimmer*, 365 F. Supp. 3d at 496; *ART+COM*, 155 F. Supp. 3d at 511-12.

Similarly, Ms. Kindler did not provide any analysis as to why the parties selected ████████ ██████████████████ for the 2021 Conformis-Stryker Settlement Agreement, which she in turn used for Medacta USA's MyShoulder products.  *Id.* at 196:17-199:25.  When asked why the parties ██████████████████████████████████ Ms. Kindler's only response was: "I don't know why in the world I would do that," and "I did not evaluate why Conformis and Stryker didn't enter into a different agreement than they did enter into."  *Id.* at 199:10-200:23, 201:23-202:8.  When asked how the parties decided they would use ████████████, she responded: "Just like with

32

MicroPort. I wasn't at the table." *Id.* at 206:18-207:16. In her view, she does not "need all of that to make an assessment as to how the value the parties agreed upon would inform [the] hypothetical negotiation or not inform a hypothetical negotiation." *Id.* at 207:12-16.

In sum, Ms. Kindler's reports are devoid of any analysis as to why the parties to each Settlement Agreement decided on the royalty rate that they did. As discussed above, Ms. Kindler's approach is unreliable because it contains "no analysis of the underlying litigation and how it may have affected the royalty rate." *Zimmer*, 365 F. Supp. 3d at 496; *see also ART+COM*, 155 F. Supp. 3d at 511-12 (same). "Without analysis of the litigation, the conclusion cannot be based on 'sound economic and factual predicates.'" *AVM Techs.*, 927 F. Supp. 2d at 143. Accordingly, Ms. Kindler's reasonable royalty analysis should be excluded as unreliable and unfairly prejudicial.

### 2. Ms. Kindler Failed to Account for Significant Differences Between the Scope of Settlement Agreement Licenses Versus the Hypothetical Negotiation

Ms. Kindler's royalty rate analysis should also be excluded as unreliable and unfairly prejudicial because she relies on the Settlement Agreements without accounting for significant differences between the scope of the licenses granted during the hypothetical negotiation and the later-in-time Settlement Agreements. "[T]he plaintiff must show that the scope of the prior license agreements that it intends to rely on is comparable to the scope of the license the parties would negotiate for the patents-in-suit." *AVM Techs. Ltd. Liab. Co. v. Intel Corp.*, No. 10-610-RGA, 2013 WL 126233, at *3 (D. Del. Jan. 4, 2013). "This means that a patentee may not argue that prior licenses granting rights to entire portfolios of patents are comparable to a license that the parties would have negotiated for a single asserted patent." *Id.* But that is precisely what Ms. Kindler argues.

This is a four-patent case where the hypothetical negotiation would contemplate only "a bare patent license from Conformis to Medacta" for the four Asserted Patents relating to the

accused MyKnee and MyShoulder products.  Ex. 12, Kindler Op. Rpt. ¶ 87.c., 91.a. (same); Ex.

13, Kindler Dep. Tr. at 28:21-24 (admitting "[t]he hypothetical negotiation in this case would

contemplate a license to the four asserted patents"), 165:25-166:4 (admitting the license would be

a "bare patent license agreement").  In contrast, none of the Settlement Agreements granted a bare

patent license, or a license to the four Patents-in-Suit here.  *See* Ex. 13, Kindler Dep. Tr. at 233:15-

25.  Nor did they cover only the knee and shoulder joints at issue in this case.  *See id.* at 233:10-

14.  Instead, the Settlement Agreements involved much broader licenses, including combinations

of (i) licenses to Conformis's **entire** patent portfolio, (ii) cross licenses, (iii) mutual releases, (iv)

non-asserts, and/or (v) other immunities.  *See* Ex. 12, Kindler Op. Rpt. ¶ 87 (2015 Conformis-

MicroPort Agreement), ¶ 83.b (2021 Conformis-Stryker Settlement Agreement), ¶ 89 (2018

Conformis-Smith & Nephew Settlement Agreement), ¶ 91 (2020 Conformis-Zimmer agreement).

The licenses therefore involve different economic considerations that are **not** applicable to the

hypothetical negotiation.  *See* Ex. 13, Kindler Dep. Tr. at 166:16-168:6 (explaining that the

hypothetical negotiation contemplates a bare license and therefore would not contemplate mutual

releases, non-asserts, and other immunities).

The below chart illustrates just some of the differences in the licenses and related economic

considerations at issue in the Settlement Agreements versus the hypothetical negotiation:

| Agreement | Year | Scope of License | Covered Joints[11] |
|---|---|---|---|
| Hypothetical Negotiation | 2013 | Bare license to four Patents-in-Suit in the United States | Knee and shoulder |
| Conformis-MicroPort Settlement Agreement | 2015 | Worldwide license to all existing issued patents and patent applications, as well as certain future patents.  *See* Ex. 13, Kindler Dep. Tr. at 95:22-96:11. | Knee<br>*See* Ex. 13, Kindler Dep. Tr. at 96:12- |

---

[11] *See* Ex. 12, Kindler Op. Rpt. at p. 62, Table 8 (summarizing "covered joints" for each
agreement).

| | | | | 21. |
|---|---|---|---|---|
| Conformis-Smith & Nephew | 2018 | Worldwide license to the patents asserted in that case and related patents.<br><br>Included cross license, mutual releases, non-asserts, and other immunities. *See* Ex. 12, Kindler Op. Rpt. ¶ 89.b; *see also* Ex. 13, Kindler Dep. Tr. at 95:22-96:11 (explaining that case involved nine asserted patents). | | All joints for instruments; knee only for off-the-shelf implants |
| Conformis-Zimmer Settlement Agreement | 2020 | Worldwide license to the patents asserted in that case, as well as related patents and applications.<br><br>Included cross license, mutual releases, non-asserts, and other immunities. *See* Ex. 12, Kindler Op. Rpt. ¶ 91.c; *see also* Ex. 13, Kindler Dep. Tr. at 160:2-16 (agreeing that case involved a cross license to various patents and patent applications); *id.* at 164:24-165:24 (agreeing the license was broader than the hypothetical negotiation). | | Knee, hip, and shoulder |
| Conformis-Stryker Corp., et al. | 2021 | Worldwide license to all existing issued patents and patent applications, as well as certain future patents. *See* Ex. 12, Kindler Op. Rpt. ¶ 78.g. | | Shoulder, elbow, wrist, hand, foot, and/or ankle |

Given these significant differences between licenses granted by the Settlement Agreements, "[n]o reasonable juror could consider these broad portfolio license agreements" to be comparable to a bare license for the four patents-in-suit here. *AVM Techs.*, 2013 WL 126233, at *3.

While Ms. Kindler acknowledged each of these differences in her report and deposition, she failed to provide any analysis accounting for the significant differences between the scope of the licenses granted during the hypothetical negotiation and the later-in-time Settlement Agreements. At best, Ms. Kindler "provides examples of how the … license agreements differ from the hypothetical agreements," but "she does not explain how her methodology accounts for these differences." *Sprint Commc'ns Co. LP v. Comcast IP Holdings LLC*, No. 12-1013-RGA, 2015 WL 456154, at *2 (D. Del. Jan. 30, 2015) (Andrews, J.).

Ms. Kindler, for example, acknowledges that "the Conformis-MicroPort agreement included a license grant that covered a larger number of patents than the Patents-in-Suit." Ex. 12, Kindler Op. Rpt. ¶ 88. She also agreed that this agreement contained a ███████████████ ████████████████████████████████████████████████████████████████ and applications identified in Exhibit A to the Settlement Agreement. Ex. 13, Kindler Dep. Tr. at 141:6-12. But rather than accounting for these differences in scope, Ms. Kindler simply swept the differences aside based on her "understand[ing]" from a discussion with Mr. John Slamin— Conformis's Chief Technology Officer—t████████████████████████████████████ ███████████████████████████████████ *Id.* As this Court has previously found, such "vague allegations of comparability" are "not sufficient, especially where the agreement occurred seven years after the hypothetical negotiation date" and include multiple U.S. and foreign patents and applications. *See Sprint Commc'ns v. Comcast*, 2015 WL 456154, at *2. Further, Ms. Kindler's summary of her "conversation" with Mr. Slamin does not address the different **scope of the license** in the Conformis-MicroPort agreement, nor show that the scope was comparable to the license from the hypothetical negotiation. Ms. Kindler cannot be permitted to discharge her duty to "show that the scope of the prior license agreements that [she] intends to rely on is comparable to the scope of the license the parties would negotiate for the patents-in-suit" based on undisclosed substance from an all too convenient "conversation" with Conformis's employee. *See AVM Techs.*, 2013 WL 126233, at *3.[12]

---

[12] While Ms. Kindler does not disclose the actual substance of her "conversation" with Mr. Slamin, her conclusion from that conversation is at odds with the testimony of Conformis's 30(b)(6) witness, Mr. Jeff Kogle, that was designated on topics relating to the negotiations and terms of Conformis's license and settlement agreements. Mr. Kogle did not know how the different terms of the settlement agreements affected their comparability. *See* Ex. 16, Kogle Dep. Tr. at 282:2-286:6. And when Medacta USA's counsel attempted to investigate what drove the negotiations, Conformis's counsel repeatedly instructed Mr. Kogle "not to divulge information about the

As another example, Ms. Kindler states that the 2018 Conformis-Smith & Nephew Settlement Agreement included a license grant for the asserted patents in that case and "involved a broader license grant than considered by the parties at the hypothetical negotiation."  Ex. 12, Kindler Op. Rpt. ¶ 89.b.  "In contrast," Ms. Kindler admits, "the hypothetical negotiation would relate to a bare patent license from Conformis to Medacta."  *Id.*; *see also* Ex. 13, Kindler Dep. Tr. at 125:17-25, 126:9-18.  But nowhere does Ms. Kindler explain how her methodology accounts for these important differences.  Instead, Ms. Kindler states that "Conformis's agreement with Smith & Nephew" is an "[i]ndicator of value relating to the Patents-in-Suit" where it ███████ ████████████ like the Conformis-MicroPort Settlement Agreement.  Ex. 12, Kindler Op. Rpt. ¶ 124.d; *see also id.* at ¶ 13.l.

Ms. Kindler's use of the Settlement Agreements as "an *ex-post* indication as to the value of a license to the Patents-in-Suit" or characterization of the Settlement Agreements as "probative as to the value of the Patents-in-Suit" does not remedy the problem.  *See* Ex. 12, Kindler Op. Rpt. ¶¶ 83.b.iii.-iv., 85, 87.c.-d., 88, 90, 92, 93, 120 f.-g.  "Without adequately accounting for the differences in economic circumstances" between the Settlement Agreements and the hypothetical negotiation, the Settlement Agreements "cannot be considered economically comparable" and cannot properly be used a "check."  *ART+COM*, 155 F. Supp. 3d at 511-512 (granting motion to exclude reliance on license agreements—five of which were settlement agreements—as a "check" on reasonable royalty analysis).

In short, Ms. Kindler fails to account for the differences in the scope of the licenses or the effect of multiple patents being included.  Instead, Ms. Kindler simply applies the ███████ ████

---

negotiations of these agreements . . . because that's privileged."  *Id.* at 109:17-110:10; *see also id.* at 140:15-25, 154:7-14, 173:2-8 (same).

for knees from the Conformis-MicroPort Settlement Agreement and the ████████ for shoulder from the Conformis-Stryker Settlement Agreement to the hypothetical negotiation without any adjustment.  Ex. 12, Kindler Op. Rpt, ¶¶ 14, 120.d.  "[T]o the extent the lack of comparability could be accounted for," Ms. Kindler "has not attempted to do so."  *Sprint Commc'ns v. Comcast*, 2015 WL 456154, at *2.  Accordingly, Ms. Kindler's reasonable royalty analysis should be excluded as unreliable and prejudicial.  *See id.* at *2 (striking damages opinion where expert did "not explain how her methodology accounts for the[] differences" between the license agreements and the hypothetical negotiation); *Zimmer Surgical*, 365 F. Supp. 3d at 496 (reasonable royalty analysis based on settlement agreement unreliable where he does not address "the effect of multiple patents being included in the license").

### 3.    Ms. Kindler Impermissibly Relies on Settlement Agreements Occurring After the Hypothetical Negotiation

The "minimal probative value" of litigation settlements to calculate a reasonable royalty "is even less, where, as here, the settlement agreements occurred years after the hypothetical negotiation." *Sprint Commc'ns v. Charter*, 2021 WL 982732, at *9-10 (citation omitted).  As this Court has noted, "prior settlement agreements . . . are not relevant when they occurred after the date of the hypothetical negotiation, as the hypothetical negotiation occurred . . . before them." *Id.* at *9 (citing *Applied Med. Res. Corp. v. U.S. Surgical Corp.*, 435 F.3d 1356, 1366 (Fed. Cir. 2006)).  That is because the parties "would not have been aware of the verdicts or settlements at the time of [the] hypothetical negotiation[]." *See id.* ("[N]one of the settlement agreements . . . would have been a 'factor of which the parties would have been aware at the time of their hypothetical negotiation.'" *Id.* (quoting *Sprint Commc'ns Co. v. Time Warner Cable, Inc.*, 760 F. App'x 977, 981 (Fed. Cir. 2018)).

In *Sprint Commc'ns v. Comcast*, this Court excluded expert testimony concerning

settlement agreements occurring "seven (7) years after the hypothetical negotiation" for one of the asserted patents, and "thirteen (13) years" and "fourteen (14) years after the hypothetical negotiation" for two other asserted patents.  2015 WL 456154, at *2.  In doing so, the Court noted (under similar circumstances as here) that the expert's "vague allegations of comparability" were "not sufficient, especially where the agreement occurred seven years after the hypothetical negotiation date." *Id.*  For these same reasons, Ms. Kindler's "vague allegations of comparability" are not sufficient, especially given that Settlement Agreements all occurred 2-to-8 years after the hypothetical negotiation date in February 2013.  *See id.*  Because "such materials are irrelevant to the hypothetical negotiation at hand, they should not have been considered in [Ms. Kindler's] reasonable royalty calculation." *Sprint Commc'ns v. Charter*, 2021 WL 982732, at *9.

*        *        *

"As there is little probative value in the settlement agreements in informing a hypothetical negotiation," Ms. Kindler's heavy reliance on the Settlement Agreements was unreliable from the start. *Id.* at *10.  The unreliability of Ms. Kindler's analysis was exacerbated by: (i) her failure to account for the significant differences between the scope of the licenses granted during the hypothetical negotiation and Settlement Agreements; (ii) her vague allegations of comparability and conclusory reliance on "conversations" with Conformis employees; and (iii) the fact that the Settlement Agreements occurred 2-to-8 years after the hypothetical negotiation.  Accordingly, Kindler's reasonable royalty analysis should be excluded as unreliable and prejudicial.

## VI.    CONCLUSION

For the reasons provided above, no dispute of material fact remains and the Court should grant summary judgment (i) of noninfringement regarding the '482 Patent claims 14 and 17; (ii) of noninfringement regarding the '304 Patent and the '161 Patent; and (iii) that pre-suit damages

are unavailable to Conformis for the '304, '161, and '482 Patents.  The Court should likewise exclude Ms. Kindler's unreliable and insufficiently supported royalty rate opinions.

Dated: June 3, 2022

Respectfully submitted,

MORGAN, LEWIS & BOCKIUS LLP

*/s/ Amy M. Dudash*

Jason C. White (admitted *pro hac vice*)
Scott D. Sherwin (admitted *pro hac vice*)
Nicholas A. Restauri (admitted *pro hac vice*)
Karon N. Fowler (admitted *pro hac vice*)
Michael T. Sikora (admitted *pro hac vice*)
Morgan, Lewis & Bockius LLP
110 N. Wacker Drive, Ste. 2800
Chicago, IL  60606
Telephone:  312.324.1000
Fax:  312.324.1001
jason.white@morganlewis.com
scott.sherwin@morganlewis.com
nicholas.restauri@morganlewis.com
karon.fowler@morganlewis.com
michael.sikora@morganlewis.com

Amy M. Dudash (DE Bar No. 5741)
1201 N. Market Street, Suite 2201
Wilmington, DE 19801
(302) 574-3000
amy.dudash@morganlewis.com

*Attorneys for Defendant*
*Medacta USA, Inc.*

40